## Wytheville,

77  573
99  426

### HATCHER AND AL. V. HALL AND ALS.

July 10th, 1883.

1. LACHES AND LAPSE OF TIME.—It is an inherent doctrine of courts of equity to refuse relief where there have been gross *laches* in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights. This doctrine, founded on considerations of natural justice and public policy, is always firmly enforced, especially where the immediate parties to the transactions are dead.

2. IDEM.—*Harrison and als.* v. *Gibson and als.*, 23 Gratt. 212, approved.

3. IDEM—*Case at bar.*—Testator devised his land and died in 1851. In 1852, under decree, it was sold by his executors to pay his debts. In 1858 sale was confirmed and an account ordered of the administration, and of balance of purchase money unpaid, and to whom due. Vouchers were laid before a master and lost *durante bello.* The purchase was transferred to B. H., one of the executors, with the consent of the others. After the war B. H., adjudicated a bankrupt, surrendered the land as assets. It was sold in parcels, the purchasers paying for improving and occupying the same. The devisees, with notice, stood silently by; but in 1876, after the death of all the executors and the master, and the loss of the papers, brought ejectment. Purchasers enjoined. Devisees answered, denying all the material allegations. Accounts were taken, and a decree entered to sell the land to pay balances held to be due devisees. On appeal—

HELD:

The devisees, though in form defendants, are in substance plaintiffs, seeking by ejectment to disturb a *status*, in which, without sufficient explanation, they have long acquiesced; and it is too late for them to obtain relief here without disregard of established principles.

Appeal from decree of circuit court of Chesterfield county. This case was argued at Richmond but decided at Wytheville.

John Howlett died in 1851, testate. To the appellees, as his residuary legatees, he devised certain lands. Soon after his decease, his executors, of whom one was Benjamin Hatcher, sold all his personalty not specifically bequeathed, and in January, 1852, they filed in the county court of said county, their bill averring the insufficiency of the personalty sold, to pay the debts, and the necessity for selling the land devised, and praying for a decree therefor. The residuary devisees, being infants, answered by guardian *ad litem.* A decree of sale was entered; and the land was sold, but nothing further was done until August, 1858, when the report of sale was filed. From that report it appeared that the land was sold at public auction to one John Foster, the highest bidder. He transferred his rights, with the sanction of the executors, to one Green (between whom and Benjamin Hatcher a partnership existed). Green dying, Hatcher became solely interested and assumed the entire liability for the purchase. Accompanying the report were affidavits showing the adequacy of the price and the *bona fides* of the transaction whereby Hatcher had become the purchaser.

The court on 9th August, 1858, confirmed the report, and directed a commissioner to settle the executorial accounts, and to ascertain the balance unpaid of the purchase money, and how much thereof was due to the devisees, respectively. Commissioner L. M. Burfoot undertook to execute this order. Before him certain papers and vouchers were laid by Hatcher, who appears to have been the acting executor. No report was returned by the commissioner, who died before the close of the war. Near the close of the war, Federal troops occupied his office and his papers were scattered and some of them destroyed. After the war, Benjamin Hatcher sold part of the land to his son, Thomas Hatcher. Afterwards he was adjudicated a bankrupt and surrendered the balance of the land as part of his assets. The assignee in bankruptcy sold this balance in parcels, which passed into the hands of the appellants who improved and occupied the same as their homes.

After the death of all the executors, in the latter part of 1876, the appellees brought ejectment in the said circuit court to recover of the appellants the land occupied by them. Thereupon the latter brought their bill, setting out the facts as aforesaid, and avering they had a complete equitable defence which they could not make at law. They also averred, that the testators' debts were numerous and large; that to pay them B. Hatcher had exhausted large part of the purchase money, and had fully satisfied the claims of the residuary devisees. Certain debts believed to have been paid, were respectively set out, and it was stated that the papers laid before the commissioner, having been lost, it was impossible to make a more specific statement of the debts paid. And they prayed that the further prosecution of the action of ejectment be enjoined, and for general relief. Injunction was granted on condition of confession of judgment at law to be disposed of as the court.should direct. The appellees answered, denied the validity of the decree of sale by the county court, and that any of the purchase money was ever paid, and insisted that B. Hatcher was himself the real purchaser of the land at his own sale, and, therefore, acquired no title. In fact, they denied most of the material allegations of the bill. Accounts were taken, and a decree entered in favor of the appellees for certain balances held to be due them respectively, and directing the sale of the land to pay the same.

From this decree, the appellants obtained an appeal.

*C. C. McRae*, for the appellants.

*W. J. Dance*, and *T. M. Miller*, for the appellees.

LEWIS, P., delivered the opinion of the court.

After stating the case, the learned president proceeded:

The circuit court, by its decree, recognized the validity of the sale of the land under the decree of the county court, and its

subsequent acquisition by Hatcher; and of that decree the appellees are not here complaining. The appellants insist that it is erroneous on the ground, mainly, of the lapse of time and the *laches* of the appellees.

Upon this subject the law is well settled. It is an inherent doctrine of courts of equity to refuse relief where there has been gross *laches* in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights. And the principle, founded as it is, upon considerations of natural justice and public policy, is always firmly enforced, especially in cases involving transactions to which immediate parties are dead.

In *Harrison and others* v. *Gibson and others*, 23 Gratt. 212, the court, speaking through Staples, J., and following its previous rulings in similar cases and that of Lord Camden in the leading case of *Smith* v. *Clay*, 3 Bro. C. C., 639, note, said: "It is a familiar doctrine of courts of equity that nothing can call forth these courts into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing. I shall not undertake to review the cases, or to discuss the principles bearing upon this point. The whole subject has been repeatedly considered by this court, and the law well settled. The cases do not fix any period as limiting the demand for an account. If, from the delay which has taken place, it is manifest that no correct account can be rendered, that any conclusion to which the court can arrive must at best be conjectural, and that the original transactions have become so obscured by time and the loss of evidence and the death of parties, as to render it difficult to do justice, the court will not relieve the plaintiff. If, under the circumstances of the case, it is too late to ascertain the merits of the controversy, the court will not interfere, whatever may have been the original justice of the claim." Accordingly, it was held that although the time which had elapsed might not of itself constitute a statutory bar to the claim asserted in that case, yet that the neglect of the parties for fourteen years to prosecute their suit, when

considered with other circumstances in the case, justified the dismissal of the plaintiff's bill.

In *Carr's adm'rs and others* v. *Chapman's legatees,* 5 Leigh, 176, the authorities were elaborately reviewed, and the same principles declared. See also *Stamper's adm'r* v. *Garnett and others,* 31 Gratt. 550 ; 1 Barton's Ch'y Practice, 90, and cases cited.

Applying these principles a few words are sufficient to dispose of the present case. There is nothing in the record to show fraud on the part of Hatcher or any one of his co-executors, or to reasonably explain the long delay of the appellees in asserting their rights. The action of ejectment was not begun until after the lapse of nearly twenty-five years after the sale of the land under the decree of the county court, and after it had passed into Hatcher's possession. The record does not disclose the exact ages of the residuary devisees, but it is fairly deducible therefrom that the youngest became of age, if not before, soon after, the commencement of the war, or at least fifteen years before the action was brought. Meanwhile, Hatcher, the active executor, who survived his co-executors, had died, in consequence of which, and by reason of the lapse of time and the probable loss of papers, a settlement of the executorial accounts had become impossible. At the time the action was brought, the papers and vouchers which had been delivered to commissioner Burfoot were supposed to have been all destroyed. But afterwards, and after testimony had been taken in the present suit, certain receipts were found among other papers which had previously been taken from a mass of scattered papers in the office formerly occupied by the commissioner. These receipts showed payments by the executors to certain of the residuary devisees, and of larger sums than were admitted by them before the receipts were produced. Indeed, it is insisted by the appellants, that taken in connection with the other testimony and the circumstances of the case, they show payment in full of the claims of the appellees. It is clear that a part at least of the purchase

money for the land was required to pay the debts of the estate. The bill filed in 1852, alleged that not a small part of it would be so required; but how much, and therefore how much was left for distribution among the devisees, cannot now be ascertained. The appellees lay much stress upon certain recitals in the deed of Hatcher, as the surviving executor of John Howlett, to his son, Thomas Hatcher, for a portion of the land sold the latter. That sale was made in 1855, and the deed was executed in 1869. It recites, among other things, that the purchase money for the land had not been paid when the sale of a part of it was made to Thomas Hatcher. But that may all be true, and yet it does not affect the merits of the case; for that was before the payments were made to the devisees which are shown by the recovered receipts and other testimony to have been made by the executors.

It is certain, that after those payments were made, no claim was asserted by the devisees in the lifetime of the surviving executor, either to the land or to any part of its proceeds. E. J. Howlett, one of the devisees, was a judgment creditor of Benjamin Hatcher, and as such proved and collected his debt in full in the proceedings in bankruptcy. But he then asserted no claim as residuary devisee to the land surrendered by Hatcher, or demand against him for any liability growing out of his transactions as executor. The land was sold by the assignee as a part of Hatcher's estate, and presumably with the knowledge of the appellees, and certainly without objection or protest on their part. They silently stood by and saw improvements put upon it by the purchasers, asserting no adverse claim till after Hatcher's death, when it had become impossible to settle necessary accounts and to do justice between the parties. They have thus slept upon their rights, if they have any, and are not entitled to the interference of a court of equity. It is true they are the defendants in this suit, but substantially they are plaintiffs, seeking, as in their action of ejectment they sought, to disturb a state of things in which, without sufficient explanation, they have long acquiesced. It is now too late for them to do so with-

out manifest injustice to the appellants and a disregard of the established principles by which in such cases courts of equity are always governed.

The decree of the court below, must, therefore, be reversed, and a decree entered releasing the judgment confessed by the appellants in the action of ejectment, and perpetuating the injunction restraining the further prosecution of that action.

The decree is as follows:

This cause, which is pending in this court at its place of session, at Richmond, having been fully argued but not determined at said place of session, this day came again the parties by their counsel, and the court having maturely considered the transcript of the record of the decree aforesaid and the argument of counsel, is of opinion, for reasons stated in writing and filed with the record, that the said decree is erroneous; therefore it is decreed and ordered that the said decree be reversed and annulled, and that the appellants recover against the appellees their costs by them expended in the prosecution of their appeal here. And this court now proceeding to render such decree as the said circuit court ought to have rendered, it is decreed and ordered that the judgment confessed by the appellants in the action of ejectment, in the proceedings mentioned, be, and the same is hereby, released and set aside; and it is further decreed and ordered, that the injunction awarded by the said circuit court restraining the appellees, their agents or attorneys from the further prosecution of the aforesaid action of ejectment be, and the same is hereby, made perpetual. Which is ordered to be certified to the said circuit court of Chesterfield county. And it is further ordered, that this decree be entered on the order book here, and forthwith certified to the clerk of this court, at Richmond, to be entered on his order book there.

DECREE REVERSED.