121   273
132   621
133    37

121   273
139   285
71a   298

121   273
85a   670

121   273
163   243
163   387

## WENDOVER v. BAKER, *Appellant.*

### Division Two, March 24, 1894.

1. **Practice:** ACTION AT LAW: EQUITABLE DEFENSE. Where the answer to an action at law sets up an equitable defense and prays for affirmative relief, the case becomes an equitable·suit and is governed by the rules of procedure applicable thereto.

2. ———: ———: ———. Declarations of law, whether given or refused, will not be considered in reviewing an equity case on appeal.

3. **Note:** SPECIFIC PERFORMANCE: LACHES. An answer in an action on notes set up plaintiff's agreement to cancel them on defendant's surrender of the land mortgaged to secure them, and defendant's performance of the agreement and that six years had elapsed since the making of the agreement through plaintiff's attorney, and that the attorney was dead. It did not charge that defendant ever demanded the notes or took any steps to compel their surrender, nor did it offer any excuse for the delay. *Held,* that the answer was fatally defective because of the laches shown on its face.

4. ———: ———: ———. The fact that the defense was not urged until after the death of the attorney who could have explained the transaction indicated laches.

5. ———: ———. A contract will not be specifically enforced where it is impossible to understand one of its conditions.

6. **Mortgage:** SURRENDER OF PREMISES: CONSIDERATION. Surrender of mortgaged premises after condition broken is no consideration for an agreement by the mortgagee to cancel the notes secured thereon.

7. **Presumption:** ORDINARY COURSE OF BUSINESS. The law will presume that transactions were conducted according to the ordinary course of business and the experience of common life.

8. **Evidence:** CONTRACTING AGENT: WITNESS. Where the agent with whom a contract was made is dead, the other party to the contract is incompetent to testify as to transactions had with the deceased agent.

9. **Contract:** STATUTE OF FRAUDS. An oral agreement to cancel a mortgage note in consideration of the surrender of the premises is within the statute of frauds.

VOL. 121—18

*Appeal from St. Louis City Circuit Court.*—HON. JAMES
E. WITHROW, Judge.

AFFIRMED.

Action on three promissory notes, begun April 30,
1890. Notes dated November 1, 1879; one for $3,000,
due one year; other two for $120 each, due six and
twelve months. Plaintiff, payee; defendant, maker.
Answer pleaded, *first*, that the notes were without con-
sideration; *second*, certain equitable defenses to the effect
that contemporaneously with the execution of the notes,
defendant executed a deed of trust to John D. S. Dry-
den as trustee, to secure them, on a certain lot in Ulri-
ci's addition to the city of St. Louis, at that time and
now, with improvements thereon worth $5,000; that on
the maturity of the first note defendant did not pay it,
and by the terms of the deed of trust all of the notes
became due at once, and the trustee proceeded to adver-
tise the property for sale, to take place on June 29,
1880; that shortly after the time of the insertion of said
advertisement it was orally mutually agreed, between
the plaintiff and the defendant, that if defendant would
waive all his rights and defenses under said mortgage,
and would surrender the immediate possession of said
premises to the mortgagee, that the plaintiff would
waive all claims and rights as holder of the notes
declared on in plaintiff's petition and secured by said
deed, and would cancel and surrender the same; that
upon the making of said agreement, defendant imme-
diately surrendered possession of said premises to
plaintiff; that after such surrender, the property was
sold pursuant to advertisement, and plaintiff became
the purchaser for $900; that, conforming to the agree-
ment, defendant did not try to stop the sale, or there-
after try to reclaim the property or to set aside the sale

for inadequacy of price or to assert any other rights in the premises, and in all respects performed the agreement made, but plaintiff did not perform her part of the agreement and surrender the notes, and pretended that if the person then acting as her attorney made any such, it was never known to, or ratified by, her.   Also that, in the circumstances mentioned, plaintiff, having remained silent as to the notes for nearly ten years, was estopped from now insisting on their payment, etc.

Further, that plaintiff's then acting agent and attorney, never returned said notes to her possession, but retained them, and during the whole remaining period of her attorney's lifetime, to wit, from the twenty-ninth of June, 1880, until December 10, 1886, when he died, and from that time forward until just before the bringing of this suit, defendant was never approached by plaintiff or anyone representing her, demanding payment of said notes, though during the greater part of that time defendant had been residing in St. Louis, and had property sufficient to satisfy any judgment plaintiff could have obtained, but never inquired for the notes from her said attorney while he lived, nor from her attorney, into whose custody all the papers of her deceased attorney came after his death, and that at the institution of this suit, nearly ten years had elapsed since said sale, and more than three years from the death of plaintiff's said attorney, through whom plaintiff conducted this entire business, "*and whose death removes the most important witness of the defendant.*"   The answer concludes with a prayer that the plaintiff be restrained from prosecuting her action at law; to decree the surrender and cancellation of the notes and for other and further relief.

Plaintiff's reply denied all of the material allegations of the answer; denied that any such agreement as alleged in the answer was ever made by any agent of

hers, or that any agent of hers had any authority from her to make such agreement, or that she had any knowledge or information of such agreement or ever ratified the same; that soon after the sale she presented the notes to defendant for payment, which defendant failed to make, and she did not sue him, because she learned he had no property, etc., and did not learn of his subsequently acquired property out of which, etc., till shortly before suit brought, etc. She also pleaded that the supposed agreement alleged in the answer, was not evidenced by writing and so was void under the statute of frauds, etc., etc.

Originally a deed of trust had been given on the property by A. B. Converse and wife, the title being in the latter, to secure a note for $3,000, due in two years at eight per cent. interest. This was in 1877, the property then having been recently acquired by Converse at a valuation of $500, in a trade for another house, made with Wilkerson. Judge Dryden was the trustee in this deed and plaintiff the beneficiary. In October, 1879, when the principal note was about to mature, defendant was induced by Converse, with whom he was on intimate terms—had indorsed paper for him frequently before—to accept a transfer of the property, and to give a new note and deed of trust to take up the old note, then held by plaintiff. Defendant agreed to this without inquiry; and, accordingly, a deed was made to defendant for the property by Converse and wife, consideration $500, though nothing was paid, and defendant, by representing to Hull & Company, who had been collecting the Converse interest notes for plaintiff, that he had purchased the property, was allowed to carry out the arrangement aforesaid, and accordingly the old notes were taken up and new ones executed by defendant, the same notes in suit, the interest then due was paid, and a new deed of trust was executed to Judge

Dryden as trustee.  The new notes bore an advanced rate of interest, over the old ones, to wit, ten per cent. interest, and plaintiff was led by defendant's statements and letters to Hull, her agent, and by his promise to pay the debt at the end of one year, not to sell under the Converse deed, and to make the substitution of notes and deeds of trust, as already stated.

At this time, defendant was in possession of the litigated property, and had been thus in possession for some two years, having leased from Converse at $500 per year, and he never reconveyed the property but continued to pay rent on it as before, and never, according to his own statement, considered that he owned the property; but this was unknown to plaintiff or her trustee, who supposed him to be the owner.  He continued thus to pay rent, though at a reduced rate, $35 per month, for some six months, when he removed from the property.

When the first interest note matured in May, 1880, it was not paid.  It and the other notes had before that been placed by plaintiff in the custody of the State Savings Institution, where she had a bank account, for collection.  Notice of the maturity of the first note was sent defendant by the bank and he notified Mr. Converse.  Neither Converse nor Baker, however, paid the note, and she then called on Judge Dryden, her legal adviser, and he advised her to advertise and sell in order to get her money.  To this she consented, and he as trustee advertised the property for sale, to occur on June 29, 1880, the advertisements beginning June 7 and ending June 28.  Before this advertisement was begun plaintiff delivered to Judge Dryden the three notes sued on, all of which, by the terms of the deed had become due upon the default in the payment of one.  At the trial all of them were found to have been indorsed, in blank, by plaintiff, but she could not

remember, and the evidence did not show, when they were so indorsed, whether before or after the sale.

In regard to the agreement set up in the answer, defendant testified in his own behalf as follows: That after the publication of the trustee's notice of sale had been begun, having seen it, called upon Judge Dryden at his office in St. Louis, and had a talk with him; that he so called upon him because he was the trustee, and also, as he understood, Mrs. Wendover's attorney; that he explained to him how he came to make the notes and deed of trust, and told him, in effect, that the transfer of the property to him by Mrs. Converse was fictitious; that he had not, in fact, bought it; but it had only been transferred to him to hold for her; that he had no expectation, when giving the notes, of paying them, but expected Converse to pay them, and asked him if he would take the property and cancel the indebtedness; that while plaintiff had that deed of trust and on the face of the papers he owed her so much money, he did not want to beat her out of that money; that at the time he could have got forty judgments against him and not collected one of them; that he said to him he was perfectly willing to surrender the property to him without any kind of trouble in the world, and did not want anything to do with it, and asked him to give up his paper; that to this Judge Dryden said he would "see the property and see about it," but did not then consent to give up the notes and take the property; that nothing was said either about his giving Judge Dryden any deed for his interest in the property, or about waiving defenses or rights under the mortgage; that in that conversation what was said was simply this question that he proposed to surrender possession of the property—not to put him to any trouble in the world, saying to him, "I will give you possession of the property, and you release me on

this deed;" that two or three days later, or possibly a week, he saw Judge Dryden again, and that then they talked about the value of the property and the question of additional costs of the property going to sale, and Judge Dryden said the property was advertised for sale and the advertisement had to be paid for—was put in for so many days—and would cost no more to get the title that way than any other way—to get the title to the property, to give him possession of it; that the property was well advertised, and might as well go to sale; that he had seen the property and the probability was that they would come out more than whole; that the property would sell for more than the indebtedness; that "anyway they would take the property, and let him out of the trade"; that if he would surrender possession of the property, without any further trouble about it, he would take it for the indebtedness; that Judge Dryden told him in the second conversation that he would give him up the notes after the sale because he thought the property would bring more than the notes; that he was to give possession right away and before getting the notes; that the substance of the conversation was that Judge Dryden gave him to understand that the sale would go on and he sell as trustee, and that the notes would be given up after he gave possession; that in this second conversation nothing was said about defendant giving any deed; also, that in it waiving any rights was not the question at all, but the language was "surrendering possession of the property;" that he was not to put Mrs. Wendover to any trouble in getting possession; that Judge Dryden did not tell him not to go to the sale, or anything about it, nor to make any efforts to prevent the sale, or to redeem in case at the sale it was bought by Mrs. Wendover; that he understood he was Mrs. Wendover's attorney and not his, and having made the

trade he bothered no more about it; that at one or the other of these conversations Judge Dryden had present the notes sued on, but which one he did not remember; that he did not remember the dates of these conversations, had no memorandum of them, and had no occasion till this suit to recall them; had not carried them distinctly in his mind all this time; that he thought that he distinctly remembered all that was said in them, because it then concerned him; that at first he did not think it concerned him at all, and he paid no more attention to it than he did to a thousand details of business that he did not have particularly to look at; but that he *thought* "that he remembered everything *nearly* now."

That, acting on what was said in these conversations, he, on June 24, rented rooms on Fifth street and moved his furniture there and stored it, and his family went north as they usually did in the summer; that he then vacated the premises (209 South Fifteenth street) and sent the keys to Judge Dryden by an office boy; that the time when he did that was June 27; that he knew that was the date because in hunting the matter up "the other day" he asked his wife the day they had moved, and she found an old account book in which she kept household accounts; that she recalled the fact that she went north with a friend on June 28, and that it was in that way he could speak definitely about the dates; that he had not brought his wife's old account book to the trial as it had a lot of other things in it; that after making inquiries from his wife and seeing entries made by other people in their books, he had brought to his memory that it was on the twenty-eighth of June, but that he did not mean to say that he remembered that was the exact date, but only that after investigation he was convinced in his mind that was the date; that he had no more memory about it than

he had when his deposition had been taken in the case on January 12; that he did not remember it was the twenty-seventh, twenty-sixth or twenty-fifth, but, as he stated in his deposition, he was sure it was before the date of the sale; that in his deposition (which was produced and shown to him) he had stated it might possibly have been the first of July, or later, that he surrendered possession, but that in that he had also said he was sure it was not—had stated he was sure it was before the day of the sale; that in that deposition he had stated it might have been after the first of July that he moved away, but he was sure it was before the sale, and he so stated now; that it was on Sunday that he sent the office boy with the keys to Judge Dryden; that he did not know that June 27, 1880, was Sunday; but if it was, then he did not send the boy to Judge Dryden's on that day, and he did not pretend to be able to fix from memory the exact date that he did so.

He further testified: That soon after the trustee's sale, a week or ten days, or possibly a month, he met Judge Dryden on the street and went up to his office with him to see the result and get the notes; that he talked with him on the way and told him he wanted the notes and to settle the thing up; that Judge Dryden, however, did not give them to him but said that the house had sold for about $1,000, and that it was out of repair, and had to have a new roof on the front part, and they had had to incur expenses to the amount of $370 for repairs, and he thought he (defendant) ought to pay that in addition to surrendering possession of the property; that he asked him for the notes and spoke to him about the agreement with him about surrendering them, but he declined to give them to him and said he thought he ought to pay the $370 for repairs. Asked on cross-examination as to this interview with Judge Dryden and his refusal to give up

the notes, whether he (Judge Dryden) then repudiated the agreement, he answered: *"I am not saying what he agreed or did not agree."*

And further testifying on cross-examination he said that Judge Dryden, in answer to his statement that he was to release the notes, said he thought the house would rent for $35 a month, and he ought to pay for putting it in repair; also that he in reply, said he could not do it, did not think he ought to, and did not have the money and could not do it if he wanted to, and that that was all that was said; that he afterwards met Judge Dryden time and again on Fourth street and various places in St. Louis, but did not again ask him to surrender up the notes, nor say anything to him about the agreement; that he might have known there was a balance of about $2,000 on the notes but did not remember anything about it, and did not think it concerned him in any way; *thought that some day when he got $370 he would go and pay it.*

It was shown in evidence that, pursuant to the notice published, Judge Dryden, as trustee, sold the property at public auction, etc., on Tuesday, June 29, 1880, to plaintiff, as the highest and best bidder, for $1,000, she being represented by John W. Dryden, who was employed by her to attend the sale and do whatever he thought best for her interest. On the return of Judge Dryden and his son from the court-house to their office, they informed her, then waiting at the office, the property had been sold and that it had been bid in for her at $1,000, by John W. Dryden, and Judge Dryden informed plaintiff that left Baker indebted to her $2,000. On same day Judge Dryden executed a deed to her as purchaser of the property 209 South Fifteenth street, and this deed was filed for record on same day.

It appeared from the testimony of plaintiff, called

as a witness by defendant, that in 1880, Judge Dryden was her lawyer and legal adviser, and had been for some nine years, in connection with settling up the estate of her deceased husband, and after that was settled, in such other little business as she had, which was but little; that he advised her when she made loans and did same when loan to Baker was made; that anything of importance she had to be attended to in a business way, she got him to attend to, *"but that in such matters as he attended to for her, he always advised with her, and never transacted any business without her knowledge or without advising with her previous to the transaction;"* such was his uniform course; that she never authorized Judge Dryden, verbally or otherwise to make such an agreement as that to which defendant testified; that she never heard of such a thing until after suit brought; that she did not wish to buy the property and only renewed loan to Baker on the strength of his promise to pay the loan at the end of the year, and because she did not wish the property thrown on her hands; that Judge Dryden never informed her on the day of the sale that he had gotten possession of the property; that a few days after the sale she came into town to see what was to be done with the property, and Judge Dryden informed her that Baker had vacated the house, and had called and left the key at his office, and that was the first she knew of its being vacated; that she went to see it at once; had repairs made, including new roof, all of which did not cost over $80; that no repairs amounting to $370, were made inside of two months after her taking possession. This testimony was corroborated by the testimony of Hull her agent from his books as to the amount and value of repairs ordered a short time before that, possibly a week or two before the seventeenth of July, the time of payment.

Plaintiff also in testifying as witness for defendant, stated that she left the notes now in suit, in the hands of Judge Dryden as her lawyer *"thinking she might some time, perhaps, accomplish something with them,"* and recover the balance of the money, and expecting that in that case, he would attend to it for her; that she let the notes remain there in the office, and after Judge Dryden's death, she knew they were in the hands of his son, and once when a fire occurred in the office, the latter told her her papers were saved; that in the spring of 1890, a Mr. Birge advised her to bring suit on the notes and put them into judgment; that thereupon she made inquiries as to where defendant was living; found out what she did not know before, that he was living in St. Louis and in the insurance business; supposed that he had left the city and owned no property, as she had been informed; that on finding out these facts she went to her attorney, John W. Dryden, who looked the matter up, found Baker's name in city directory, ascertained from the records that he had property and brought suit against him at plaintiff's request.

It appeared from other testimony of defendant that from October, 1880, up to January, 1884, he was away from St. Louis the greater portion of the time; but from last mentioned date had been residing in St. Louis; but though meeting Judge Dryden frequently, never recurred to the subject of the agreement about the notes nor brought suit to enforce it; that on one occasion, in the summer of 1884, he had met Judge Dryden, who asked him how he was getting on, when he replied "Pretty well," but gave no details, *"not thinking it was any of Judge Dryden's business, and if it was, it was his place to hunt it up;"* that from the first of January, 1882, plaintiff could easily have collected $2,000 from him on execution; that from January,

1882, to 1884 or 1885, he had an average balance to his credit with the Mutual Life Insurance Company or bank of $2,500; but had no property in his own name out of which debts could be made, except the credit balance aforesaid.

The testimony as to the value of the property in controversy in 1880, at the time of the sale, varied from $2,500 to $4,500 and $5,000. The books of the assessor's office showed that defendant had no property, real or personal, assessed against him for taxes for the years 1880, 1881, 1882, 1883, 1884, 1885, 1886, 1887, 1888, except for the years 1880 and 1884, when for the first year he was assessed on $400 worth of personal property, and on the latter for $40 worth only. There was no credit entered on the notes for the $1,000. Other facts, where necessary, will be noticed hereafter.

*John M. Dickson* and *G. A. Finkelnburg* for appellant.

(1) The agreement between Judge Dryden and defendant Baker to take the property for the debt must be assumed as an established fact in the case. The testimony on this point stands uncontradicted; Mrs. Wendover only disputes Judge Dryden's authority and seeks to repudiate the agreement. (2) A trustee should always postpone a sale when necessary to obtain a fair price and should never permit the creditor to force the sale at an inadequate price. A trustee in exercising his duties and powers is trustee for both parties and is bound to act in good faith and adopt all reasonable modes of proceeding in order to render the sale most beneficial to the debtor. *Judge v. Booze*, 47 Mo. 544; *Graham v. King*, 50 Mo. 422; *Bailes v. Perry,* 51 Mo. 449; *Vail v. Jacobs*, 62 Mo. 130; *Stoffel v. Shroeder*, 62 Mo. 147; *Sherwood v. Sexton*, 63 Mo. 78; *Meyer v. Ins. Co.*, 5 Mo. App. 245. Finally it was

noticeable that the amount of the bid was not credited on the notes, tending to show that it was considered a *pro forma* sale. (3) The testimony above referred to sufficiently establishes an express authority by the words of the plaintiff herself, but direct evidence of an express authority is not required to establish an agency; it may be inferred from circumstances, and it is well settled that permitting another to hold himself out as having authority is sufficient to establish an agency as to third persons. *Cupples v. Whelan*, 61 Mo. 583; *Brooks v. Jameson*, 55 Mo. 505; *Hull v. Jones*, 69 Mo. 587; Bishop on Contracts, sec. 1091; *Watson v. Hoosac Co.*, 14 Mo. App. 585; *Keown v. Vogel*, 25 Mo. App. 35; *Nicholson v. Golden*, ·27 Mo. App. 138. (4) Judge Dryden had possession of the notes, indorsed in blank when he made the agreement with Baker. As to the peculiar effect of clothing another with the *indicia* of ownership or authority, see Story on Agency, end of sec. 443; *Rice v. Groffman*, 56 Mo. 436; *Whelan v. Riley*, 61 Mo. 565; *Butler v. Dorman*, 68 Mo. 292; (5) Nor is it necessary that the transaction between Judge Dryden and Mr. Baker should come up to the full measure of a formal contract. If Mrs. Wendover permitted Judge Dryden to hold out certain inducements, on the basis of which Mr. Baker acted or refrained from acting, then the transaction raises an equitable estoppel against the plaintiff. On the subject of estoppel *in pais* under similar circumstances we refer to Bigelow on Estoppel [5 Ed.], pp. 564, 638; *Fanning v. Cobb*, 20 Mo. App. 577; *Knights v. Wiffen*, L. R. 5 Q. B. 660; *Bassett v. Holbrook*, 25 Conn. 453; *Davis v. Dyer*, 56 N. H. 142; Pollock's Principles of Contracts, pp. 641, 642. (6) When one of two innocent parties must suffer by the acts of a third, he who enabled such third party to occasion such loss ought to sustain it. *Rice v. Groffman*, 56 Mo. 434; *Crews v.*

*Garneau*, 14 Mo. App. 505; *Carroll v. Railroad*, 14 Mo. App. 490. (7) This case rests upon the general law of agency, express or implied, and not upon the special rules governing the implied powers of an attorney at law. Judge Dryden was not acting as an attorney at law in this matter but as an attorney in fact.

*John W. Dryden* for respondent.

(1) The defense considered as one of a contract between defendant and plaintiff to release him from the payment of the notes sued on, failed because, even assuming defendant's testimony to be true, it was shown to be a different agreement from that pleaded, and to be without any valuable consideration to support it. (2) Defendant's legal, if not his moral, duty clearly required him to surrender the mortgaged premises without any compensation therefor, and if he did not he would have held on as a trespasser simply and in his own wrong. Of the soundness of this proposition there can be no doubt. 1 Jones on Mortg. [4 Ed.], p. 568, section 667, and p. 605, section 702; *Johnson v. Houston*, 47 Mo. 227; *Walcop v. McKinney*, 10 Mo. 229; *Reddick v. Gressman*, 49 Mo. 389. (3) "A promise to pay a person for doing an act which he is legally bound or it is his duty to do, is a mere *nudum pactum*, and will not support an action." *Kaye v. Dutton*, 7 M. & G. 807; *Richardson v. Mellish*, 2 Bingh. 244; *Cowper v. Green*, 7 M. & W. 633; *Crosby v. Wood*, 6 N. Y. 369; *Vanderbilt v. Schreyer*, 91 N. Y. 392; *Seybolt v. Railroad*, 95 N. Y. 562; *Connover v. Stillwell*, 34 N. J. L. 54; *Ayers v. Railroad*, 52 Iowa, 478. (4) The defense as one of contract also failed because not proved by any credible evidence. (5) No authority from plaintiff to Judge Dryden to make the

agreement alleged or testified to was shown, but the contrary.   (6) All that the evidence warrants, is the inference that Judge Dryden had such powers as belong to attorneys at law, or other agents for collecting debts. And that being true, it is plain that it can not be found that he had the power, or that defendant had any right to believe that he had the power, to make the agreement which defendant claims he made. For it is a perfectly well settled proposition, both in this state, and everywhere, that an attorney at law has no power by virtue of his mere relation, or his general employment, and in the absence of express direction from his client, to either release, or compromise, his client's demand, or to receive anything else in payment of it than money. Wharton on Agency, secs. 208, 583; Mechem on Agency, secs. 813, 819; Story on Agency [7 Ed.], sec. 99; Weeks on Attorneys, secs. 219, 232; *Walden. v. Bolton*, 55 Mo. 405; *Spears v. Ledergerber*, 56 Mo. 465; *Semple v. Atkinson*, 64 Mo. 504; *Melcher v. Bank*, 85 Mo. 362; *Roberts v. Nelson*, 22 Mo. App. 28. That he especially has no power to accept land, or an interest in land, in satisfaction, see *Walden v. Bolton*, 55 Mo. 409; *Stackhouse v. O'Hara*, 14 Pa. St. 88; *Kirk's Appeal*, 87 Pa. St. 243; s. c., 30 Am. Rep. 357, and note.   (7) The alleged agreement was one for the sale of an interest in or concerning lands and not being in writing was void under the statute of frauds.   *Howard v. Easton*, 7 Johns. 205; *Smart v. Harding*, 15 C. B. 652; *Cocking v. Ward*, 1 C. B. 858; *Kelly v. Webster*, 12 C. B. 283; Browne on Stat. of Frauds [2 Ed.], sec. 231; and Wood on Stat. of Frauds, sec. 225, p. 411.   (8) The fact that the defendant surrendered the possession does not take the case out of the statute.   Such surrender was not accepted by plaintiff under any such contract, and was not an act pointing unmistakably to the existence of such a contract as is claimed by defend-

ant to have been made. *Ells v. Railroad*, 51 Mo. 204; 1 Story's Eq. Jurisprudence [12 Ed.], secs. 762, 764; *Sitton v. Shipp*, 65 Mo. 302; *Townsend v. Hawkins*, 45 Mo. 288; *Spalding v. Conzelman*, 30 Mo. 177; *Emmel v. Hayes*, 102 Mo. 186; Bishp. Eq. Jur. [4 Ed.], sec. 385; Browne on Stat. of Frauds [2 Ed.], secs. 476, 478; Pomeroy on Spec. Performance, secs. 154, 155. (9) That the property was worth $2,500, or less, and that plaintiff bought it at an open, public auction for $1,000 cash, does not constitute a defense to her suit for the $2,000 balance. (10) That a sale made in the usual way would not be set aside merely for inadequacy of price, unless the inadequacy was so gross as to be evidence of fraud, is well settled. *Meir v. Zalle*, 31 Mo. 331; *Railroad v. Brown*, 43 Mo. 294; *Phillips v. Stewart*, 59 Mo. 491; *Kline v. Vogel*, 11 Mo. App. 211; s. c., 90 Mo. 239; *Erwin v. Parham*, 12 How. 197. (11) And that a sale of property estimated to be worth $2,500, or even $5,000, at $1,000, is not grossly inadequate, is plain. Sales where the discrepancy between the price realized and the supposed value was as large, or much larger, have been repeatedly upheld. *Kline v. Vogel*, 11 Mo. App. 211; s. c., 90 Mo. 239, where property worth $3,000 to $10,000 sold for $500; *Phillips v. Stewart*, 59 Mo. 491, 493, where land worth $2,700 sold for $600; *Erwin v. Parham*, 12 How. 197, 206, where a debt of $260,000 sold for $600; *Northrop v. Cooper*, 23 Kan. 440, where property worth $900 sold for $100; *Hoyt v. Pawtucket Inst.*, 110 Ill. 397, where property worth $15,000 sold for $5,250.

SHERWOOD, J.—I. In entering on a discussion of the facts aforesaid, and the principles applicable thereto, it is well enough to say at the outset that the correctness of the *declarations of law*, miscalled *instructions*, whether given or refused, will not be considered,

because the answer of defendant setting up equitable defenses and praying for affirmative equitable relief, converts this case into a proceeding in equity to be governed by principles and rules of procedure applicable to such cases. *Freeman v. Wilkerson*, 50 Mo. 554; *Conran v. Sellew*, 28 Mo. 320; *Ellis v. Kreutzinger*, 31 Mo. 432; *Richardson v. Pitts*, 71 Mo. 128; *Stivers v. Horne*, 62 Mo. 473; *Allen v. Logan*, 96 Mo. 591.

This being true, this case must be regarded as one where defendant is the *actor*, asking affirmative relief in a proceeding for specific performance, and is to be governed by all rules of pleading, procedure and evidence as pertain to such cases.

II. Treating the answer, then, as a bill in equity, seeking specific performance, let us look at the requisites of such a bill. On this topic a recent author says:

"The rule as to pleadings is more stringent in bills for specific performance than in other cases. The terms of the contract must be distinctly alleged, so as to leave none of its essential details in doubt or uncertainty. So, in like manner, the proof is required to be clear, definite and satisfactory. The contract must not only be proved in a general way, but its terms must be so precise and exact that neither party could reasonably misunderstand them; and there must be a strict correspondence between the alleged terms of the contract and the proof by which it is sought to be established." 2 Beach on Mod. Eq. Jur., sec. 584.

"If any conditions are omitted, or left obscure and undefined, so as to leave the intention of the parties respecting the substantial terms of the contract uncertain, the case is not one for specific performance. The case must be made out with greater certainty than would be required in an action at law for damages." 2 *Ibid.*, sec. 582.

If the party seeking specific performance has been

guilty of gross *laches*, or if he applies for relief after a long lapse of time unexplained by equitable circumstances, his bill will be dismissed. 2 Story's Eq. Jur. [13 Ed.], sec. 771. In order to avoid such dismissal, where his bill discloses such laches or long lapse of time, the complainant must set forth therein, such equitable circumstances as will excuse the laches and explain the delay. *Anderson v. Frye*, 18 Ill. 94, and cases cited.

In *Sullivan v. Railroad*, 94 U. S. 807, Mr. Justice Swayne says: "To let in the defense that the claim is stale, and that the bill can not, therefore, be supported, it is not necessary that a foundation shall ·be laid by any averment in the answer of the defendants. If the case, as it appears at the hearing, is liable to the objection by reason of the laches of the complainants, the court will, upon that ground, be passive and refuse relief."

*a.* Now the answer of the defendant shows, that notwithstanding the agreement was made with plaintiff in the latter part of June, 1880, to cancel and surrender to him the notes, and notwithstanding he surrendered possession of the premises as agreed, that plaintiff did not comply with her agreement by canceling and surrendering the notes, and that nearly *six years and a half* elapsed between the making of the agreement, its violation by plaintiff and the death of Judge Dryden, "through whom plaintiff conducted this entire business, *whose death removes the most important witness of the defendant,*" and yet the answer makes no allegation that defendant made any demand ·for the notes, took any steps or instituted any proceedings to compel the performance of the violated contract, nor is there the slightest attempt made in the answer to excuse the delay. Manifestly the answer is bad on its face, and should have been so holden by the lower court.

*b.* The badness of the answer is intensified by

the further fact and consideration that it distinctly alleges that the death of Judge Dryden *removes the most important witness of the defendant.*" Because it is always a material and laches-indicating circumstance that the claim was not asserted until after the death of those who could have explained the transaction. 1 Beach on Mod. Eq. Jur., sec. 18.

In such circumstances, as is aptly said by STAPLES, J.: "If, from the delay which has taken place, it is manifest that no correct account can be rendered, that any conclusion to which the court can arrive must at best be conjectural, and that the original transactions have become so obscured by time and the loss of evidence and the death of parties, as to render it difficult to do justice, the court will not relieve the plaintiff." *Harrison v. Gibson*, 23 Gratt. 212.

A similar line of remark was employed in *Seminary v. Kiefer*, 43 Mich. 105, where Judge COOLEY said: "It would be the height of injustice to permit complainant, with full knowledge of the facts, to delay suit while the persons who were familiar with the facts were one by one passing away, and at last bring suit under circumstances which at the best must leave the court in doubt whether the remaining evidence does not disclose a partial, defective and misleading case. A court of equity ought to refuse interference under such circumstances." This last case was approvingly cited in *Lenox v. Harrison*, 88 Mo. 491. See, also, *Hatcher v. Hall*, 77 Va. 573; *State ex rel. v. West*, 68 Mo. 229; *Barnes v. Taylor*, 27 N. J. Eq. 259; *Bolton v. Dickens*, 4 Lea, 577.

*c.* The contract alleged in the answer and as already quoted, is the following: "That shortly after the time of the insertion of said advertisement it was orally mutually agreed, between the plaintiff and the defendant, that, if defendant would waive

all his rights and defenses under said mortgage, and would surrender immediate possession of said premises to the mortgagee, that the plaintiff would waive all claims and rights as holder of the notes declared on in plaintiff's petition and secured by said deed, and would cancel and surrender the same." What is meant in the quotation and contract thus cited by the words: "If the defendant *would waive all his rights and defenses under said mortgage*," we are not informed. And in such cases, as heretofore stated, the rule is that if any conditions are "left obscure and undefined" and "the substantial terms of the contract, uncertain" specific performance will not lie.

In order to be specifically executed in a court of chancery, a contract must be *"certain and defined."* Fry on Spec. Perf. of Contracts [3 Ed. Am. Not.], p. 155; *Mastin v. Halley*, 61 Mo. 196. Here it is simply impossible to tell what is meant by a waiver by a mortgagor of "all his rights and defenses under said mortgage," if indeed they could be said to be worth anything, where, as here, the notes secured had all become due, the mortgagor $1,500 in debt, insolvent and without property.

*d.* But this allegation of the answer of the defendant as to "rights and defenses," is not supported by his own testimony, only as follows: He testified that the agreement made with Judge Dryden was that defendant "would surrender possession of the property without any further trouble about it," and that Judge Dryden "would take the property for the indebtedness;" that defendant offered to give Judge Dryden "possession of the property" if the latter "would release him on the deed;" that *"waiving any rights was not the question at all; it was that defendant was not to put Mrs. Wendover to any trouble in getting possession of the property."* And defendant did not

testify as to any agreement to waive any right but that of possession.

This being the case, such a contract would have no valuable consideration to support it, because default being made in the payment of the note first due, the others became due, under the terms of the deed of trust, simultaneously with the first note (*Noell v. Gaines,* 68 Mo. 649), and the trustee could have entered at once for condition broken, and taken possession of the premises or brought ejectment and recovered possession. *Johnson v. Houston,* 47 Mo. 227; *Reddick v. Gressman,* 49 Mo. 389. The mortgagor after condition broken, is really a tenant at will and may be ejected by the mortgagee or trustee without notice. 1 Jones on Mortg. [4 Ed.], secs. 667, 702.

As defendant had no legal right to retain possession of the premises after condition broken, hence his agreement to surrender possession was a *mere nude pact* constituting no valuable consideration. *Vanderbilt v. Schreyer,* 91 N. Y. 392, and cases cited; Pollock's Princ. Cont. [4 Ed.], p. 177. And as all contracts upon which specific performance is asked must be based on a valuable consideration (Fonblanque's Eq., bk. 1, p. 47, ch. 1, sec. 5; *Tucker v. Bartle,* 85 Mo. 115), the contract as testified to by defendant must, therefore, be held invalid by reason of having no legal consideration to support it.

*e.* The authorities say that, if it is left doubtful from all the evidence in the case whether a contract was concluded or not, equity will not grant its specific relief. Pomeroy, Spec. Perf., sec. 58. The evidence of the contract in such case must be clear and satisfactory, and the *onus* rests on the party who alleges and seeks the specific enforcement of it, and unless such evidence is brought forth, the complainant must fail. Justice WASHINGTON says: "If the contract be vague

or uncertain, or the evidence to establish it be insufficient, a court of equity will not exercise its extraordinary jurisdiction to enforce it, but will leave the party to his legal remedy." *Colson v. Thompson*, 2 Wheat. 336. See, also, *Taylor v. Williams*, 45 Mo. 80; *Strange v. Crowley*, 91 Mo. 287.

Here the contract was by no means satisfactorily established, as will be seen by reading the foregoing recitals of the evidence as contained in the record. The story defendant tells is the sole basis of the alleged contract, assuming its validity. That story is improbable on its face for several reasons: He testified that in 1877 the house was in the "most complete order of any house he could find in the city; that the house was in first class shape and his wife decided to rent it; that Converse had overhauled the house in all parts and painted and papered it all over at a cost of $700, and yet in a little over two years from that time a further expenditure was required of $370; but on this point he is contradicted by the testimony of Hull and plaintiff to the effect that no such expenditure was made; that only about $80 was expended in repairs on the house for at least two months after the sale took place. Besides, the conceded high character of Judge Dryden forbids the idea that he, having agreed to accept the surrender of the mere possession of the property in exchange for the notes, would endeavor, after defendant had surrendered possession and asked for the notes to *tack on* an additional condition to the contract; to repudiate it in fact by declining to give up the notes, and by telling defendant that *"he thought he ought to pay the $370, for repairs."*

On this point counsel for defendant say: "There is another significant circumstance in the fact that Judge Dryden asked Baker to pay $370 for putting the house in good repair after it had been sold under a deed of

trust. This could only be done on the theory that he (Baker) was released on the notes." But if *"he, Baker, was released on the notes"* there would be no "theory" left on which to bottom a demand or request for $370.

No one can carefully read this testimony without reaching the indubitable conclusion that defendant felt that he must have and present *some excuse* for failing to demand the notes or to assert his legal right to them during the *six years and a half* that Judge Dryden *"his most important witness"* remained alive. This $370 story is evidently an afterthought; it is contrary to the "ordinary course of business" and to the "experience of common life," in favor of which the law will always presume (*Fitzgerald v. Barker*, 85 Mo. 13; *Bank v. Aull's Adm'r*, 80 Mo. 199); that defendant, whom the law will hold was presumptively "vigilant in guarding his property and prompt in asserting his rights, orderly in conducting his affairs, and diligent in claiming and collecting his dues" (1 Greenleaf on Evidence, sec. 38) would suffer his notes, the possession of which constituted *prima facie* evidence against him, to remain in the hands of an attorney, that attorney drawing near to life's close, without defendant taking any steps to enforce his rights or to compel the observance of a contract faithfully and promptly completed on his part, and especially so, when that attorney acting in bad faith, according to defendant's story, had declined to comply with the contract, and had endeavored to exact an additional and unwarranted moneyed consideration for consummating that contract.

Considering all of these circumstances, and the further ones that Judge Dryden was not authorized by plaintiff to make such a contract, never told her about it, but told her on the day the sale occurred that

defendant still owed her $2,000 on the notes; that
defendant tells conflicting stories as to whether the
surrender occurred before or after the sale and in
regard to different incidents relating thereto; that an
experienced lawyer like Judge Dryden would not in all
human probability have assented to such an improvi-
dent contract as, without any deed being made by
defendant, to accept a mere exchange of the debt for
the simple possession of the premises, something that
could have been promptly secured whether defendant
would or not,—defendant's story is wholly insufficient
as a basis on which to build a decree for specific
performance.    See authorities cited *supra*.

*f.* But in this connection it is not improper to
say that, although the point was not raised in the lower
court,   Judge Dryden, according to defendant's story,
being the *"contracting agent"* of plaintiff, defendant
was incompetent to testify as a witness touching trans-
actions had with the deceased agent.   The same rule
of exclusion prevails in such cases as prevails in
regard to a surviving party to a contract.   *Williams v.
Edwards*, 94 Mo. *loc. cit.* 451; *Stanton v. Ryan*, 41 Mo.
510; *Fulkerson v. Thornton*, 68 Mo. 468; *Butts v.
Phelps*, 79 Mo. 302.   In *Williams v. Edwards, supra*,
the defendant there told a story which, in outline and
salient features, considerably resembles the one told in
the case at bar.

But, notwithstanding defendant was incompetent
to testify, no objection having been made thereto, his
testimony stands as valid, subject, however, to such
observations as will naturally suggest themselves as to
his testimony being uncontradicted by the only one
who, if living, could have contradicted it.

*g.*   Moreover, could the contract to which the
defendant testified be regarded as valid on every other
score and as established by the proof, still it must be

held invalid under the statute of frauds. All the interest that defendant mortgagor had in the land was an equity of redemption; but this could not be bought or sold without writing. Browne on the Stat. of Frauds, secs. 229, 231 and cases cited.

III. In conclusion it may be said that, although the credit of $1,000 was not, as it should have been, placed on the notes, yet this omission and any inference therefrom is so fully countervailed by other circumstances as not to merit serious consideration. Therefore, judgment affirmed. All concur.