CARA LEE WITHERS et al., Appellants, v. KANSAS CITY SUBURBAN BELT RAILROAD COMPANY et al.

**Division Two, March 15, 1910.**

1. **LAW CASE: Equitable Defense: Trial By Jury.** The filing of an answer in a law case, in which is set up equitable matter *in pais* entitling the defendants to an affirmative relief, and a prayer for such relief, converts the case from one at law to one in equity; and this principle is bottomed on the express statutory provision that the defendant may set forth by answer as many defenses as he may have, whether they be such as have heretofore been denominated legal or equitable, or both.

2. ————: ————: ————: **Pleading: Practice.** The right to plead both a legal and an equitable defense in one answer, and the right of the court to first hear the cause on its equity side, is no longer an open question in this State.

3. ———: ———: ———: **Equitable Defense Stated: Accretion.** Where the issue tendered by the counterclaim is not merely one of accretion or no accretion, but one of equitable estoppel and laches, the case is triable by the court, and plaintiffs are not entitled to a jury to determine the question of accretion. Nor are defendants barred from asserting their equitable defense because in their answer they assert that they and those under whom they claim had a fee simple title to the land in suit.

4. ———: ———: **Accretions: Estoppel: Laches: Quieting Title.** Plaintiffs brought their suit to recover the value of lands which had been appropriated and were being used by defendant railroad as a right of way. Defendants answered asserting that more than six years before suit was brought they had purchased all the record title that was then in existence. *Held,* that plaintiffs are not entitled to a jury to determine whether or not the lands were accretions, in view of the fact that defendants in their answer, recognizing that their title might not be perfect and that there might be substance in plaintiffs' claim that they were entitled to the land as accretions, pleaded that plaintiffs ought not to recover the land from these defendants because they were estopped by their conduct from demanding the same. And a plea that plaintiffs, without any record title whatever to the land in suit, but claiming it wholly as an accretion to their lot, and knowing it was claimed and adversely occupied by others, stood by silently while defendants and those through whom they claim, with no knowledge or notice of plaintiffs' claim by accretion, purchased from those who were in actual possession, recorded their deed, and spent large sums of money in reclaiming the land, filling up sloughs, constructing trestles and constructing valuable improvements, states facts constituting an equitable defense of estoppel and laches to plaintiffs' petition alleging the land is an accretion to their lot. And those facts having been established by the evidence, plaintiffs are not entitled to recover the value of the land, whether it was an accretion to their lot or not; on the contrary, defendants are entitled to a decree quieting the title in them.

5. **ACCRETIONS: Notice.** Where there was a distinct outline of a former riprap bank of the river between plaintiffs' lot and the land now in suit, at the time defendants began to exercise possession, and at that time there was a slough extending up to that riprap bank and between it and the island which defendants bought, they were not chargeable with notice that the land on the river side of the riprap bank was an accretion to plaintiffs' platted lot.

7. ———: ———: **Evidence: Word on Map.** The word "accretion" on a map, found in defendants' possession and bearing a date prior to their purchase or occupancy, may be of little significance when the history of the map itself is kept in view.

Appeal from Jackson Circuit Court.—*Hon. W. B. Teasdale,* Judge.

AFFIRMED.

*Scarritt, Scarritt & Jones* for appellants.

(1) The trial court erred in trying and determining the whole controversy defined by the pleadings, without the aid of a jury. (a) This action as outlined in the plaintiffs' petition is one to recover money. The defendants pleaded as defenses to that action the Statute of Limitations, the assertion that the land in question was not accretions to plaintiffs' shore land, that defendants owned the fee simple title, and estoppel. These issues were properly triable to a jury under the Constitution and laws of Missouri. The trial court actually tried and determined these issues. The decree finds that the allegations of the counterclaim are true; that "neither the plaintiffs, nor any of them had, at the beginning of this suit, and the said plaintiffs have not now, nor has any of them any estate, right, title or interest whatsoever in and to the said land." It was error, we assert, for the court in the absence of a jury and against the protest of the plaintiffs to try and determine these issues. R. S. 1899, secs. 691 and 694; Kabrich v. Insurance Co., 48 Mo. App. 397; Henderson v. Dickey, 50 Mo. 165; Wolff v. Schaeffer, 4 Mo. App. 372, and 74 Mo. 158; Carter v. Prior, 78 Mo. 224; Booth v. Lay, 83 Mo. App. 606; Grayson v. Weddle, 80 Mo. 39; Crowe v. Peters, 63 Mo. 429; Jones v. Moore, 42 Mo. 420; McReynolds v. Railroad, 34 Mo. App. 581; Estes v. Fry, 94 Mo. 271; Kerstner v. Forweg, 130 Mo. 196; Anglo-American Co. v. Lombard, 132 Fed. 733; Ming v. Olster, 195 Mo.

460; Thompson v. Bank, 132 Mo. App. 225; Lee v. Conran, 213 Mo. 404. The cases relied upon by defendants are distinguishable from the foregoing by the fact that the equitable defenses in those cases cut from under the plaintiffs the ground upon which the plaintiffs based their right of recovery. It must be borne in mind that the defendants in their answer unequivocally assert that they have a fee simple title to the land in question. The eighth count of the answer, called a counterclaim, nowhere avers that the defendants' legal title to the land in question is defective, but reiterates the claim that they are the owners of the legal title to the land. It charges "that all the right, title, interest and estate of persons and corporations really having any rights in or title to said property were acquired by this defendant." Therefore, under the allegations of the so-called counterclaim, no relief is necessary in respect to the establishment of the legal title in the defendants. They say they already have it. Allen v. Logan, 96 Mo. 591; O'Day v. Cohn, 131 Mo. 321; McCullom v. Broughton, 132 Mo. 601; Swon v. Stevens, 143 Mo. 384. (b) This suit has for its object the assessment of the value of the land being appropriated for public use and the recovery of the amount so determined. The railroad company by appropriating private land to its use for railroad purposes cannot, by its failure to institute condemnation proceedings, deprive the owner of those underlying rights guaranteed him by the State Constitution respecting such a contest. Constitution, art. 12, sec. 4; Railroad v. Railroad, 118 Mo. 599; Pitkinn v. Shacklett, 106 Mo. 557. (c) The counterclaim recites the allegations of fact contained in the first seven counts of the answer proper, and does not state a cause of action of which equity alone can take cognizance. The question of estoppel *in pais* may be tried by a jury with the same facility as any other question of fact. Pitman v. Mining Company, 78 Mo. App. 438; Gunn v.

Bates, 6 Cal. 263; Maxwell v. Bridge Co., 41 Mich. 453; Daley v. Wingert, 210 Pa. St. 169; Ming v. Ostler, supra. (2) The proof wholly fails to establish facts constituting an equitable cause of action as distinguished from a law action, and therefore the court erred in entertaining jurisdiction of the case as an equity cause and in trying it without the aid of a jury. If a cause of action enforceable only in equitable jurisdiction has been asserted in the so-called counterclaim, the sole issue which was presented and which should have been determined by the trial court, without a jury, was not primarily and essentially whether the plaintiffs or defendants owned the land in question, but it was a restricted issue as to whether or not the defendants owned the land by virtue of an equitable claim or right which could not have been by reason of the strict rules and practice of the law courts established as a defense to the cause of action set out in plaintiffs' petition. In other words, the sole question is this: Was the conduct of plaintiffs such that, although they are the owners of the land in controversy by reason of its being accretion to their shore land, equity will not, because of their conduct, permit them to assert that ownership? Upon this record the unquestioned fact is that plaintiffs had no knowledge or notice that the defendants or any other purchasers of title were buying, or intended to buy, any rights in the land in question from others than themselves. The external evidence that the land was an accretion to the shore land was plain anl palpable and was as well known to the defendants as to the plaintiffs. The defendants, before they dealt with the land, had notice that it was accretion and their own records show that they so regarded it. There is no evidence that the land was less valuable before it arose above the water level at the ordinary stage of the Missouri River than after it was filled in ten or twelve feet; that filling occurred mostly from general and promiscuous dumping.

All such dumping was gratuitious, or at least there is no evidence that it cost anybody anything. In Kansas City, as is generally known, it is argued that low-lying lands have an additional value because the owners of hills will pay for the privilege of depositing their excess earth there. There is no suggestion in the record that the defendants would not have done what they did do if the plaintiffs had served notice upon them every day of their rights in and to this land. The mere fact that the defendants and their emissaries were getting all sorts of deeds from persons whose title had been washed out by the navigable waters of the Missouri river, deeds from extinct corporations, deeds from the county, deeds from the city, all of which were based on inconsistent theories, shows beyond cavil that the defendants were not deceived or misled by any conduct or silence of the plaintiffs, but were doing their utmost to subvert and override the rights of the plaintiffs. Lee v. Conran, 213 Mo. 404; R. S. 1855, chap. 158, secs. 1, 8; 11 Am. and Eng. Ency. Law (2 Ed.), p. 432; Bank v. Duncan, 86 N. Y. 221; Bartless v. Kauder, 97 Mo. 361; Cantwell v. Crawley, 188 Mo. 44; Weir v. Lumber Co., 186 Mo. 396. The silence and inaction which create an estoppel occur under such circumstances and are committed by a person sustaining such relation to the other that the person seeking to enforce the estoppel would reasonably presume such silence and inaction to be a positive representation on the part of the other of the truth of the fact of which the contrary is sought to be asserted. Pomeroy, Eq. Jur., sec. 805; Brant v. Virginia Co., 93 U. S. 326; Bloomfield v. Bank, 121 U. S. 121; Bigelow on Estoppel (4 Ed.), p. 445; Gray v. Gray, 83 Mo. 106; Yates v. Hurd, 8 Col. 343; Delaplaine v. Hitchcock, 6 Hill 14; Herman on Estoppel, sec. 948; Commonwealth v. Moltz, 10 Pa. St. 527; Brewer v. Railroad, 5 Met. 479; Boggs v. Merced Co., 14 Cal. 279; Crary v. Dye, 208 U. S. 515; Water Co. v.

Verdugo, 152 Cal. 655; Ditch Co. v. Canal Co., 27 Col. 267; Piedmont Mills v. Railroad, 131 Ga. 129; Bales v. Perry, 51 Mo. 449; Blodgett v. Perry, 97 Mo. 263; Hequembourg v. Edwards, 155 Mo. 522.

*S. W. Moore, Cyrus Crane* and *R. E. Ball* for respondents.

(1) There was no error in transferring the cause to the equity side of the docket. Freeman v. Wilkerson, 50 Mo. 556; Estes v. Fry, 94 Mo. 271; Allen v. Logan, 96 Mo. 598; Clyburn v. McLaughlin, 106 Mo. 524; O'Day v. Conn., 131 Mo. 325; Swon v. Stevens, 143 Mo. 392; Dunn v. McCoy, 150 Mo. 561; Martin v. Turnbaugh, 153 Mo. 185; Wilson v. Jackson, 167 Mo. 157; Myers v. Schuchman, 182 Mo. 171; Wendover v. Baker, 121 Mo. 289; Trust Co. v. Nathan, 175 Mo. 41; Courtney v. Blackwell, 150 Mo. 278; McCollum v. Broughton, 132 Mo. 620; Shaffer v. Detie, 191 Mo. 388; Bouton v. Pippin, 192 Mo. 359; Pitts v. Pitts, 201 Mo. 359; Hubbard v. Slavens, 218 Mo. 619; Guffey v. O'Reiley, 88 Mo. 430. (2) The evidence fully sustained the equitable defenses and warranted the court in granting the equitable relief prayed for—the case was a proper one for the jurisdiction of a court of equity. Defendants were charged with notice. Shaffer v. Detie, 191 Mo. 393. Equitable estoppel. 1 Story Eq. Jur., secs. 385, 387; Wendell v. Rensselaer, 1 Johns. Ch. 344; Storrs v. Barker, 6 Johns. Ch. 166; Guffey v. O'Reiley, 88 Mo. 424; McDonald v. Association, 175 Mo. 276; Rice v. Bunce, 49 Mo. 235; Spence v. Renfro, 179 Mo. 422; Godeffrey v. Caldwell, 2 Cal. 489. Laches. 18 Am. and Eng. Ency. Law, p. 103; Galliher v. Cadwell, 145 U. S. 373; Dunklin Co. v. Chouteau, 120 Mo. 596; Simpson v. Stoddard Co., 173 Mo. 469. Relief is asked under section 650 by pleadings which make the issues triable before a chancellor. Wehrman v. Conklin, 155 U. S. 314; Wilson v. Lubke, 176 Mo. 210; Mason v. Perkins, 180 Mo. 702; Lee v. Conran, 213 Mo. 411. Oth-

er relief may be asked in a cross-bill in addition to that given by section 650. Garrison v. Frazier, 165 Mo. 46; Lane v. Dowd, 172 Mo. 167; Sneathen v. Sneathen, 104 Mo. 201; Ball v. Woolfolk, 175 Mo. 285; Huff v. Land Co., 157 Mo. 65; Garrison v. Frazier, 165 Mo. 40; Meriwether v. Love, 167 Mo. 514. Equity jurisdiction was also conferred by the necessity of having the boundaries ascertained and defined. DeLassus v. Faherty, 164 Mo. 361; Primm v. Raboteau, 56 Mo. 414; Spencer v. O'Neill, 100 Mo. 58; Swope v. Weller, 119 Mo. 565; Boland v. Ross, 120 Mo. 216. Relief in equity given to prevent multiplicity of suits and vexatious litigation. Swope v. Weller, 119 Mo. 565. Adverse possession entitled defendants to equitable relief. Sharon v. Tucker, 144 U. S. 533; Bohart v. Chamberlain, 99 Mo. 622; Walker v. Converse, 148 Ill. 628; McRee v. Gardner, 131 Mo. 606.

GANTT, P. J.—This is a suit to recover the value of a certain tract of land which the plaintiffs claim to own and which is being used and appropriated by the defendants for a railroad right of way and other railroad uses. The original petition was filed December 19, 1898. On March 22, 1901, the petition was amended, making the receivers of the railroad company and the Kansas City Southern Railway Company, which had been organized for the purpose of taking over the properties of the Suburban Belt Company, parties defendant. To this amended petition all of the defendants, on April 10, 1901, filed an answer, which consisted merely of a general denial. On December 30, 1901, the death of Webster Withers was duly suggested to the court, and the cause was revived as to his interest in the name of Cara Lee Withers, as executrix and sole devisee, and the amount of the recovery was by an amendment to the petition changed from $50,000 to $85,000. The cause was tried on the pleading as amended, and on May 21, 1902, the jury

rendered a verdict for the plaintiff for $83,500. The circuit court on April 18, 1903, granted a new trial, on the grounds that the court had improperly rejected competent evidence, and that the verdict was excessive.

It appears that on January 14, 1902, the Kansas City Southern Railway Company received a master's deed, under the decree of the United States Circuit Court, for all the railroad property of the Kansas City Suburban Belt Railroad Company, and took possession thereof. Afterwards on April 25, 1903, a second amended petition was filed, and to this second amended petition the several defendants filed separate answers; while separate they contained the same defenses. As the case comes to this court for review upon the issues raised upon the eighth count of the defense set up in the answer and the reply thereto, it is deemed best to set forth this cross-bill and counterclaim in full:

"That the Consolidated Terminal Railway Company, in February, 1892, purchased a portion of the described real estate for value, and took a deed therefor and recorded it, and in July, 1892, the said last named company consolidated with and its rights became vested in the Kansas City Suburban Belt Railroad Company; that the Kansas City Suburban Belt Railroad Company purchased the remaining portion of the described real estate in December, 1902, for full value; that said purchases were in good faith, without notice or knowledge of the claims of the plaintiffs; that the Consolidated Terminal Railway Company executed its mortgage of $750,000 covering the real estate acquired by it as aforesaid, and other property, which mortgage was duly recorded in May, 1892; that part of the bonds secured by said mortgage were used in improving the described property; that default was made in the performance of the conditions of the mortgage, and Knott and Swinney were appointed receivers

on September 6, 1900, and duly qualified as such, and upon such appointment the receivers took possession of said property and held such possession until the sale of the property; that the same was sold under decree of the United States Circuit Court, at Kansas City, and the Kansas City Southern Railway Company became the purchaser thereof; that all of the property is still in public use as a railroad property.''

Paragraph three alleges that the Consolidated Terminal Railway Company and those succeeding it did proceed to improve the said land for railroad purposes and expended large sums of money in so doing; that said land was filled and the surface thereof raised; that it was subject to overflow by the Missouri river and that the filling and raising to the surface were necessary to escape the danger of overflow and to use the land for railroad purposes; that railroad tracks, switches and trestles have been built on the land at great cost, and that such expenditures were made in good faith without notice or knowledge of the claims of the plaintiffs.

Paragraph four alleges that the defendants in the suit have successively from time to time expended large sums of money in connection with the use of the land for railroad purposes, for maintaining tracks and switches thereon and repairing same; that plaintiffs with full knowledge have stood by and permitted said improvements and expenditures to be made without objection and without asserting any claim to the property until the bringing of this suit.

Paragraph five alleges that defendants are informed and believe the plaintiffs claim the described land as accretions to Block 19 in West Kansas Addition, which claim they deny. It is then charged, that if any part of said lands consists of accretions it consists of accretions which attached to land not owned by plaintiffs or those under whom plaintiffs claim, but by other persons or corporations. The title of

the latter they claim to have acquired and reiterate the ten-year Statute of Limitations.

Paragraph six charges that plaintiffs claim other lands than the tract described in the petition, which, it is alleged, are claimed to have been formed by accretions, and that the boundaries of such lands are uncertain in nature and character, and that it is necessary that the boundaries between the tract of land mentioned in the amended petition and such other lands of the plaintiffs be ascertained, fixed and determined.

Paragraph seven charges that the amended petitions have been filed by the plaintiffs for the purpose of harassing and annoying the defendants, and that the plaintiffs threaten to bring other suits and institute other proceedings, and that the purpose of this suit and the threatening litigation is to becloud defendants' title.

Paragraph eight reiterates the charge that the Consolidated Terminal Railway Company and the defendant succeeding it put in their tracks, paid the taxes and improved the described property in good faith and that plaintiffs stood by and made no claim to said property, and that such payments were made without any notice of any claim of the plaintiffs.

Paragraph nine is a reiteration of the thirty-one year Statute of Limitations, under section 4268 of the Revised Statutes of 1899, in substantially the same language as that of count 4 of the answer.

Paragraph ten reiterates the previous allegations as to defendants' acquisition of the land and expenditures thereon with the knowledge and acquiescence of plaintiffs and invokes the principles of laches and estoppel.

The prayer is as follows:

"Wherefore, this defendant asks that plaintiffs' petition be dismissed and that the court adjudge and decree:

"(1)    That defendant, the Kansas City Southern Railway Company, is an absolute owner in fee simple, free from any claim, right, title, or interest of the plaintiffs, or any of them, of the real estate in said last amended petition described.

"(2)    That neither the plaintiffs, nor any of them, have any claim, possessory or otherwise, to such property.

"(3)    That the limit and boundary between the said property so owned by defendant, The Kansas City Southern Railway Company, and the property of the said plaintiffs, be ascertained, fixed, determined and adjudged.

"(4)    That plaintiffs and each of them be enjoined from prosecuting in any form, any suit or action against this defendant for said property or its possession or its value.

"(5)    That this defendant have such other and further relief as may be just and equitable, and have a decree for its costs herein incurred and expended."

The reply of the plaintiffs to this answer, counterclaim and cross-bill consisted of a general denial of each and every allegation of new matter therein contained.

After the issues were made up the plaintiffs filed a motion for an order directing the course of the trial, in which they expressly demanded a trial by jury upon the whole case, and the court made an order that the issues raised by the latest amended petition and the first seven counts of the answer, should be tried before a jury. And that the eighth count of the answers and reply thereto and the issues thereby raised, should be tried before the court, first, and to this order of trial the plaintiffs excepted.

On March 12, 1904, defendants amended their respective answers by interlineation and the plaintiffs then filed their formal motion to set aside the order of trial, which motion the court overruled and the

plaintiffs saved their exceptions. The cause came on for hearing in October, 1904, and the plaintiffs again requested a trial by jury upon the eighth count or counterclaim and the reply thereto, and this also was denied.

Upon a hearing the court made its decree that the Kansas City Southern Railway Company was the absolute owner in fee simple, free from any claim, right, title or interest of the plaintiffs to the real estate described in the amended petition, and quieted the title of the defendants therein.

The claim of the plaintiffs to this land grows out of their ownership of block 19 of West Kansas Addition to the city of Kansas City. This is a block of ground in the vicinity of the Missouri river in the district known as the West Bottoms of Kansas City, Missouri. This block 19 was acquired in 1874 and 1877 by the plaintiffs, or their ancestors, except so much of it as had already been conveyed to the Missouri River, Fort Scott and Gulf Railroad Company for a right of way. It is by reason of their ownership of this block 19 that plaintiffs assert title to the land in controversy, claiming the same as accretions to said block.

Their evidence was directed to establish that the land in suit was a part of the accretions from the Missouri river to said block 19. On the other hand, the defendants' claim to the said land was as follows: Certain railroad companies undertook to build a Belt Line in Kansas City. The Missouri corporation was styled "The Consolidated Terminal Railroad Company." The Kansas corporation carrying out the same project was known as "The United States Terminal Railway Company." The Consolidated Terminal Railroad Company was afterwards consolidated with the Kansas Belt Railroad Company, which last named company did the actual work of building and operating the

railroad, and this company passed through foreclosure, and was acquired by the Kansas City Southern Railway Company. The Kansas City Suburban Belt Railroad Company, in the construction of its railroad, built a trestle track wholly outside of and north of the north line of block 19 of West Kansas Addition number one. It built from the east in front of this block and continued on west of it. This trestle track was built in the water in the spring of 1892. The Belt Company purchased for this track a right of way from the parties appearing to have the record title thereto, so far as a record title could be obtained to said sand-bar. The defendants offered testimony tending to show that in 1891 Judge Hylmun, the company's civil engineer and surveyor, made a survey in front of or north of said block 19. Along this proposed line of railroad at block 19, the bank of the river, which the evidence tended to show had been rip-rapped with rock in 1870, was found to be a considerable distance north of the north line of the block 19 at this west end and about coincident with the block at this east end. At that time, and when the railroad began its active operation, this bank land was in the possession of Mr. H. M. Meriwether and the companies and persons represented by him or their tenants. It appears that Meriwether had taken possession of this bank land north of block 19 in the year 1889, on behalf of the heirs of Western and Grider, who had acquired their title to the same, and north of this strip of the bank land there was at the time of the construction of this railroad trestle track a slough from 150 to 200 feet wide, and north of this slough was an island in the Missouri river, which the defendants' evidence tended to show had been there as far back as 1887, as indicated by Government surveys and maps. To this island the Meriwether interests had a record title. At the time the Belt Company proceeded to acquire its right of way along and in front of block

19, according to the defendants' testimony, there was nothing disclosed by the records in the recorder's office or by the physical facts, or by way of possession by the plaintiffs or those under whom they claim, that plaintiffs had any title or asserted any claim to this land north of block 19. And thereupon the Belt Company proceeded to acquire its right of way by purchase from those who appeared to have the legal record title to the land and possession, and to build its railroad thereon. In front of this block 19, it built a trestle in the water at the south edge of the island and used boats in its work of construction. Plaintiffs made no objection to defendants building their track on said land and gave no notice of any right or title in themselves.

It appears from the testimony of Mr. Davidson, one of plaintiffs, that he knew that the land company from whom the defendants bought claimed all of this land in front of this block 19, at the time the railroad was built in 1893, and he and his associates never asserted any title thereto until they brought this action in 1898, and took no steps to interfere with them. The testimony also tended to show that the Belt Company recorded its deed from the land company to this right of way, November 21, 1892. It was engaged several months in building the trestle and in laying its tracks. The trestle track had the effect of stopping up the channel of the slough between the island and the south bank of the river. In addition to this the railroad company at considerable cost hauled in large quantities of dirt and dumped and filled in the space between the trestle and the old south bank of the river. Testimony tended to show that in doing this, it used over twenty thousand cubic yards of dirt, at the cost of some $4500. The company continued to fill in and lay more tracks at a cost of some $13,500. All this was done without any protest on the part of the plaintiff for six years. Neither the plaintiffs nor their

ancestors ever had any *record* title to any of the land north of block 19, and never paid any taxes thereon, and never had any actual possession of the land in controversy when the defendants bought. It appears that West Kansas Addition number one was platted in 1861. At that time and for years before there was a large body of land north of block 19 between it and the river. On the plat which was acknowledged and filed, there was a strip of land in front of both blocks 18 and 19 in this West Kansas Addition number one which had no opening on the west, but was designated as Fourth street, and the south line of this Fourth street was the north line of this West Kansas Addition, and beyond Sixty-fourth street there was still another large body of land between the north line of the addition and the river bank.

The evidence tends to show that after the addition was platted the river began eating away the land on the north and this continued until the riprapped bank in 1870 was constructed. The evidence tended to show that this riprapping of the bank from the Hannibal and St. Joseph bridge on the east along the river front up past this block 19 was done in 1870. One of the plaintiffs, Mr. Davidson, testified that this riprap bank was known as "the riprap of 1870," and was built from the Kaw river down to the bridge of the Hannibal and St. Joseph railroad. He testified that whenever the river started to encroach on this riprap they repaired it.

The pivotal point around which the contest was waged with great earnestness in the circuit court was the establishment of the riprap bank of 1870 and its maintenance. The evidence is very voluminous and it is impracticable to set it forth at length on either side of this controversy, and we shall state what, in our opinion, seems to be the true state of facts developed.

This riprap bank was established, and the great preponderance of the testimony, we think, shows that

it was located wholly outside of and north of block 19, and while there was evidence that from time to time, in extraordinary floods or high water, the waters of the Missouri temporarily passed over this riprap bank and covered for a short period block 19, yet we think the great burden of the testimony was that these waters would recede in a short time and leave this riprap bank intact and that it marked the permanent bank of the river in front of this block for a number of years. Mr. Davidson, one of the plaintiffs, himself testified that this riprap bank was there along the whole front of this block 19 when the plaintiff purchased that block, and that from time to time they repaired this riprap whenever the river began to encroach upon it, and that it was by the efforts of the plaintiffs and the Ft. Scott & Gulf Railroad that this bank was preserved and that it stopped further encroachments of the river along its line. An examination of the maps and surveys introduced on both sides shows that this riprap bank was north of and wholly outside of block 19. This evidence was peculiarly pertinent to the claim asserted by the plaintiffs that the right of way of the defendants belonged to them as an accretion to block 19. Because, if this bank was outside of and north of block 19 and was a permanent bank by reason of the riprap thereof, then plaintiffs' claim to the lands in suit as an accretion was without support. In this connection there was other evidence which tended to establish the defense. In the 1880's, on account of work which was done near the mouth of the Kaw river, the land along the north front of block 19 began to reappear and reform above the surface of the river and an island appeared almost directly north of this block 19. The Government survey was made of this island in 1887, as appears by one of the exhibits in evidence. Sand dealers in Kansas City obtained sand therefrom and had a plank road down the riprap bank at the foot of Bell and Genesee street. This island

kept extending to the south until only a slough sepa-
rated it from the riprap bank of 1870. The water in
this slough was deepest next to the riprap bank. In
1892, the defendants' trestle track was built in this
slough about 150 feet north of this riprap bank and
this caused the island to push in still more perceptibly
towards the south bank of the river and the slough was
filled up principally by the railroad company and be-
came solid land. In addition to the testimony of the
living witnesses, including the plaintiff, Mr. Davidson
himself, which establishes that this riprap bank was
built in 1870, and remained practically the permanent
bank of the river after that time until the formation of
the island and the building of the railroad united the
island to the main land in front of this block 19, there
was other very positive testimony to the effect that
in 1888 or 1889, Mr. Meriwether, as the attorney for
the heirs of Western and Grider, investigated the
situation with a view to the protection of their inter-
ests, and he found this riprap bank of 1870 and a strip
of land between the north line of block 19 and this bank.
He took possession of that, the parties occupying the
same at that time accepting leases from him and pay-
ing him rent therefor. The Armour Packing Com-
pany then took possession of it under Mr. Meriwether
until the Belt Railroad Company purchased it from
him. Mr. Davidson's own testimony shows that
he knew that the land company and the rail-
road company which had purchased from it, was
claiming this land as early as 1893, anyway, and
that he and his associates had notice that the com-
pany was building its railroad and filling in its track
for five years before they brought this suit, and the
only response which he gave when he was asked if he
did not know of these steps was that their rights were
protected anyway a certain length of time. During
all the time that these tracks were being constructed,
plaintiffs made no demand for possession. He testi-

fied also that the Memphis Railroad Company occupied some of the land immediately north of block 19, as well as some little that was inside of the said block. Various maps were introduced in evidence to show the location of this riprap bank, among others, the map made by Mr. Pearson in November, 1889, at a time when he had no knowledge of any controversy concerning the land, and he made it for another railroad company and not for either of the interested parties in this suit. His map shows the island just as the Government map made about that time showed it, also the riprap bank of 1870 to be outside and north of block 19. In his map this riprap is styled a revetment. Tuttle and Pike also made a map of these lands in 1893, at Mr. Meriwether's request. These gentlemen are conceded, on all sides, to be civil engineers and surveyors of most excellent reputation in Kansas City and in that portion of the State. They have compiled atlases of the city, and their maps of 1893 show the location of the island, and the Belt Company's trestle track marked on the map as a main track of the Union Terminal Railroad Company, and built in the waters of the slough between the island and the riprap bank. It showed the riprap bank to lie outside and north of the north line of block 19. This map was made nearly five years prior to the institution of this suit, and the top of this riprap bank on its east end appears to be for a short distance coincident with the north line of block 19.

John Donnelly, a civil engineer, who at various times had been the city engineer of Kansas City, testified that in 1893 what was called an intercepting sewer was built, which in part was located in front and north of block 19.

The slough, already spoken of, had become a menace to health by reason of the packing house sewage flow into it, so that this intercepting sewer was built to relieve against the slough. He identified a map,

which appears in the record to be number six in volume
two of the exhibits, by which it is shown that this
sewer was built in the slope of the riprap bank in front
of block 19. According to this map the riprap bank
was outside of and north of block 19. It is well to
remark, also, that this map was made long prior to
the controversy in this case. Then followed the map
made by Judge Hylmun in 1891, which corresponds
practically with all the other maps except that at the
extreme east end the top of the bank is shown to be
slightly east of the north line of block 19. There was
another map introduced on which the word "accre-
tions" was marked and which indicated all this land
north of block 19 by dotted lines. This map appears
to have been made in December, 1892, after the trestle
was built by the Belt Line Company. It seems that
this map was turned over by the Belt Line Company
to the Kansas City Southern when the latter purchas-
ed the road. The testimony of Judge Hylmun indicates
that it was not the result of a survey and measure-
ments. He said the only survey was of the main track
and line and that the other portions of the map were
sketched in from the city maps and other data of that
kind. He also testified that the line of this map which
runs into block 19 at the northeast corner was intended
to indicate the top of the riprap bank. This map also
shows, however, that the riprap bank was north of
and outside of the north line of block 19.

As opposed to this testimony on the part of the
defendants as to the original construction of this rip-
rap in 1870, and its permanent maintenance since that
date, as shown by the testimony of the witnesses,
among others, the plaintiff Davidson, and the testi-
mony of the maps throughout the period from the con-
struction of the riprap up to the time this suit was
brought, plaintiffs offered verbal testimony of various
witnesses as to the flowing of the waters of the river
over this riprap and up to the banks upon which the

Ft. Scott & Gulf track was constructed, but this testimony, we think, fairly weighed, shows that these extraordinarily high waters came from time to time but rapidly receded, leaving the permanent bank where the riprap was, the settled bank of the river.

There was another line of proof as already indicated, tending to disprove that the land in suit was an accretion to block 19 and that was the evidence in regard to the formation or the existence of an island in front of block 19, and the fact that whatever accretions were formed in that neighborhood attached themselves to the island and not to the south bank of the river as insisted by the plaintiffs. That there was such an island in the river north of block 19 as early as 1887, is not, we think, open to dispute. The maps, photographs and the testimony of witnesses, who lived there at that time, all go to establish this fact, and confirmatory of these maps made by the Government surveyors and the other civil engineers was the testimony of various witnesses who lived in Kansas City at that time. Thus Mr. Tuttle, who assisted in making one of the maps of Tuttle and Pike in 1893, testified that he was on the ground in 1889 and that the island was substantially as shown on his map of 1893. He testified that he made the map of Tuttle and Pike himself. In fact all the testimony shows, we think, that this island so indicated by all the maps and by the testimony of the witnesses, never has been washed away since it was plotted and mapped in 1887, and that the accretions to this island on the south, together with the filling made by the railroad companies, has filled up the space between the original south bank of the river or riprap bank and the island, and that this intermediate land was not formed by the process of accretion to the south bank or to block 19.

Other evidence may be cited and adverted to in the course of the opinion but the foregoing is a sufficient general statement of the tendency of the testi-

mony to enable us to determine the questions of law and the alleged errors assigned by the plaintiffs.

I.  It is earnestly insisted that the question of whether this land for which plaintiffs seek compensation was an accretion to block 19, or whether it was a part of lands which were in no sense a part of said block 19, and had been acquired by the defendants for a right of way from other persons in possession thereof and claiming title thereto, was a question upon which the plaintiffs were entitled to a verdict of a jury, and that the circuit court erred in determining that he would hear the same as a chancellor in the first instance without a jury.  It is asserted that the suit is one to recover money, and we are cited to section 691, Revised Statutes 1899, which provides: "An issue of fact in an action for the recovery of money only, or of specific real or personal property, must be tried by a jury, unless a jury trial be waived or a reference ordered as hereinafter provided." And section 694, which is as follows: "Where there are several causes of action united in a petition, or where there are several issues, and the court shall be of the opinion that all or any of them should be tried separately by the court or jury, it may, on the application of either party, direct separate trials, which may be had at the same or at different terms of the court as circumstances may require.  In all cases where there are separate causes of action united as aforesaid, the court shall award separate costs against the unsuccessful party, unless for good cause it shall otherwise order.  The judgment upon each separate finding shall await the trial of all the issues." We are cited to Estes v. Fry, 94 Mo 271, in which it is said: "When this trial began there were issues of fact at law and in equity to be tried. Neither party demanded a separate trial of the equity branch of the case  .  .  .   The fact that an equitable defense is interposed in an action at law, it has been

held, does not convert the suit from an action at law to one in equity. [Wolff v. Schaeffer, 74 Mo. 154; Carter v. Prior, 78 Mo. 222.] But where the answer sets up a distinct claim with the prayer for relief, which a court of equity alone can give, as is the case here, the issues made by the answer and the reply thereto should be tried as a case in equity. [Durfee v. Moran, 57 Mo. 375; Kitchen v. Railroad, 59 Mo. 517.] The court should have tried this defense itself, or sent it to a referee to hear the evidence and state an account, which would have been the prudent course to pursue; or special issues should have been framed and the opinion of a jury taken thereon."

In order to determine this right of the plaintiffs to a jury trial, it is essential to again recur to paragraph ten of the answer and counterclaim of the defendants, which in substance was as follows, to-wit: that the land in suit was capable of description and appears by record title to have been vested in persons and companies other than the plaintiffs and those under whom they claim for more than thirty-one years prior to the institution of this suit; that this defendant acquired its possession and title to said property from those who appeared to have a record title thereto and were in possession thereof as long ago as the year 1866; that said title and possession have ever since been continued down to the present time; that the full value of said property was paid therefor; that the said land could not be used without making expensive improvements thereon, because subject to overflow by the Missouri river; that as there appeared to be a perfect title to said property, the said improvements were made, and the disbursements for the purchase of said land and for the making of the said improvements, and for taxes thereon, were made in good faith, and relying upon said possession and upon said apparent title; that the plaintiffs and those under whom they claimed knew of such purchase and of

the making of said improvements and of the paying
the money for the same and the maintenance thereof,
and for taxes upon said property and permitted such
payments to be made and made no protest whatever
against the making of such payments and asserted no
claim to said property and continued from year to year
for more than thirty years without asserting any such
claim to the same and that plaintiffs and those under
whom they claim have been guilty of laches in connec-
tion with their pretended claim to said property, and
ought not in equity, at this time nor when this suit
was originally instituted, be heard to assert a claim
to said property or any part thereof, or to recover the ·
same in this action, or any other action, but should
be estopped by their conduct and laches from assert-
ing any claim to the said property or any part thereof.
That the improvements that had been placed upon
said property by the defendants and those under whom
they claim, were placed thereon in reliance upon a good
title to said property, which plaintiffs and those under
whom they claim permitted by their silence and acqui-
escence to be placed upon said property. This answer
concluded with a prayer for affirmative relief; that the
defendants should be decreed the absolute owners of
said property free from the claims of the plaintiffs
and that plaintiffs be enjoined from prosecuting any
other suit or action against the defendants for the said
property and for all equitable relief. In support of
their contention the plaintiffs cite us to numerous de-
cisions of this court and the courts of appeal, in which
it is held that an answer setting up a defense in equity
will not convert a whole case into a suit in chancery
so as to require the trial as an equity case, unless affirm-
ative relief is asked and is necessary to ascertain or
sustain the defendants' rights. [Lincoln Trust Co. v.
Nathan, 175 Mo. 32; Shaffer v. Detie, 191 Mo. 377;
Plow Company v. Hartman, 84 Mo. 610.] Unquestion-
ably this is the recognized doctrine in this State, but

it is equally well-settled law that the filing of an answer in a law case setting up equitable matter *in pais* entitling the defendants to an affirmative relief and praying for such relief convert the case from one at law to a suit in equity. [Wendover v. Baker, 121 Mo. 273; Martin v. Turnbaugh, 153 Mo. 172; Bouton v. Pippin, 192 Mo. 469.] It has often been adjudicated that this principle is bottomed on the express statutory provision that the defendant may set forth by answer as many defenses as he may have whether they be such as have been heretofore denominated legal or equitable or both. [McCollum v. Boughton, 132 Mo. 620.]

The right to plead both a legal and equitable defense in one answer and the right of the court to first hear the cause on its equitable side being then no longer an open question, the real contention in this appeal is that the estoppel attempted to be pleaded by defendant did not in fact amount to an equitable estoppel but stated a defense, if any, which was triable by a jury, and therefore the circuit court erred in denying plaintiffs a jury trial. Especially, plaintiffs insist, were they entitled to a jury on the issue of accretion or no accretion. And on this last proposition they cite with seeming confidence Lee v. Conran, 213 Mo. 404. Of that case we need only state that it was an exposition of section 650, Revised Statutes 1899. This court having on so many occasions treated the trial of the respective rights of parties to contests over titles as triable by the court, the question was presented in that case whether a jury could be demanded in an action commenced under that section, and the conclusion was reached, and we think correctly, that if the issues joined entitled the parties to an ordinary judgment at law, then, under the Constitution and laws of the State, the parties are entitled to a trial by a jury; but if the issues tendered are equitable in their nature, and call for equitable relief, then the cause is triable be-

fore the chancellor. In that case, it was ruled that the pleadings tendered the issue of accretion or no accretion only, and hence was triable to a jury. The question recurs, was the issue tendered by the counterclaim an equitable defense in this case, merely one of accretion or was it one of equitable estoppel and laches?

It is alleged by plaintiffs that because the defendants in their answer assert that they and those under whom they claim, had a fee simple title to the lands in suit, therefore they were debarred from asserting their equitable defense, but obviously this position is untenable, because the statute permits the defendants to plead both legal and equitable defenses, and although the defendants may have had a good legal defense this in no way deprived them of their right to insist on their equitable defense. That equitable defense in substance was that the defendants, as early as 1892, desiring to obtain a right of way over this land, purchased all the record title that was then in existence, but notwithstanding this, they recognized that this title might not have been perfect, and there might have been merit and substance in the plaintiffs' claim that they were entitled to these lands as accretions to block 19, which was a matter *in pais,* and therefore they say that the plaintiffs ought not to recover said real estate from these defendants because they were estopped by their conduct from demanding the same of the defendants. They assert that the plaintiffs knew at that time, and had for years known that all this land north and outside of their block 19 was claimed adversely to them, by what is known as the Meriwether companies, and they were advised that these defendants and the Belt Company under whom they claim, had purchased a right of way from the Meriwether interests, and plaintiffs stood by and saw the defendants take charge of this right of way and build a trestle some 550 feet long in front of their

block 19 as early as 1892, and that from that time on these defendants proceeded with their work of filling up the slough under this trestle work and laid tracks thereon for a period extending over four or five years, and during all that time plaintiffs made no protests, objection, or claim of any kind to this land. The case made is one in which the plaintiffs, without any record title whatever to the piece of land in suit and claiming it solely as an accretion, and knowing that it was claimed and adversely occupied by others, stood by silently while the Belt Company purchased the title of those who were in actual possession of the land, and spent large sums of money in building valuable and productive property, properties which the plaintiffs themselves say are now worth $85,000, and now after these lands have been redeemed, and these betterments have been made at large cost, plaintiffs come forward and assert that these lands were accretions to their block 19, and that they are entitled to have the defendants compensate them therefor as the owners of said land. We think the facts thus pleaded clearly constitute a good plea of equitable estoppel and laches.

The learned counsel for the plaintiffs cite us to a large number of cases on estoppel in which an estoppel *in pais* is defined as a right arising from acts, admissions or conduct and which have induced a change of position in accordance with the real or apparent intention of the party against whom they are alleged. [Gray v. Gray, 83 Mo. 106; Bigelow on Estoppel (4 Ed.), page 445; Brant v. Virginia C. & I. Company, 93 U. S. 326; Bales v. Perry, 51 Mo. 449.] On this general statement of the rule there is no doubt whatever. Indeed there is little difference of opinion in regard to what constitutes an estoppel *in pais* or an equitable estoppel. The question always arises in the application of the principles to the facts in judgment. This court in Guffey v. O'Reiley, 88 Mo. 418, had occasion to examine the effect of silence on the part of

one who held an unrecorded deed and permitting another to purchase the land without setting up his claim thereto. Said the court:

"Upon this evidence the point to be determined is whether an equitable estoppel has arisen in this cause. Lord DENMAN, who had delivered the opinion in the earlier case of Pickard v. Sears, 6 Ad. & E. 469, when he came to deliver the opinion in the later one of Gregg v. Wells, 10 Ad. & E. 98, stated that the doctrine in the former case might be stated even more broadly than it was there laid down: 'A party,' said he, 'who negligently or culpably stands by and allows another to contract on the faith and understanding of a fact which he can contradict, cannot afterwards dispute that fact in an action against the person whom he has himself assisted in deceiving.' In Niven v. Belknap, 2 Johns. 588, which was a bill in equity regarding land, the court said: 'There is an implied, as well as an express assent; as where a man who has a title, and knows of it, stands by and either encourages or does not forbid the purchase, he and all claiming under him shall be bound by such purchase. [1 Fonb. 161.] It is very justly and forcibly observed by a writer on this subject (Roberts, 130), that there is a negative fraud in imposing a false apprehension on another by silence, where silence is treacherously expressive. In equity, therefore, where a man has been silent, when in conscience he ought to have spoken, he shall be debarred from speaking when conscience requires him to be silent.' Treating on this subject, Judge STORY says: 'In many cases a man may innocently be silent, for, as has often been observed, "*Aliud est tacere, aliud celare.*" But in other cases a man is bound to speak out, and his very silence becomes as expressive as if he had openly consented to what is said or done, and had become a party to the transaction;' and after giving instances of a man standing by and encouraging, or not forbidding, a sale of his

property, or sees another person selling his land as grantor, and signs the deed made as a witness, the learned author, after stating the invalidating effect of such conduct on the title of the party guilty thereof, concludes by saying: 'For in cases where one of two innocent persons must suffer a loss, and *a fortiori,* in cases where one has misled the other, he who is the cause or occasion of that confidence by which the loss has been caused or occasioned ought to bear it. Indeed, cases of this sort are viewed with so much disfavor by courts of equity, that neither infancy nor coverture will constitute any excuse for the party guilty of the concealment or misrepresentation.' [1 Story, Eq. Jur. (13 Ed.), secs. 385, 387.] In Wendell v. Van Rensselaer, 1 Johns. Ch. 344, where no statements were made, no active inducements held out, nor encouragement given by the defendant who was grantee in the deed under which he claimed, but the grantor remained in possession, and from time to time sold portions of the land, and improvements thereon were made in full view of the defendant's residence, some of the purchasers being known to the defendant, Chancellor KENT, commenting on this state of facts, said: 'He preserved a studied silence, and gave no notice to those purchasers, or to the world, of his title. After this, he cannot be permitted to start up with a secret deed, and take the land from bona-fide purchasers under the testator. Having, for such a length of time, suffered the public to deal with the testator as the real owner, he cannot now be permitted to question or disturb any title which has thus been procured by his tacit assent. There is no principle better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares that if one man, knowingly, though he does it passively, by looking on, suffers another to purchase and expend money on land, under an errone-

ous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by this equitable estoppel.' "

Now as already said, the plaintiffs in this case had no title of record to the lands for which they now demand compensation. They were not in the actual possession of the land, but on the contrary the persons represented by Mr. Meriwether were in actual possession of the shanties immediately in front of their block 19 and south of the riprap bank, and also were asserting title to the island in front of all this property; at that time separated from it by a slough 150 to 200 feet wide.

The plaintiffs had no fences, nor were there any other physical facts or indicia of ownership in the plaintiffs or those under whom they claimed, to show that they had any title or claim whatever to any land north of block 19. In other words, they stood with a claim as secret to the lands now in dispute, as if they held an unrecorded deed to the same in their pockets. That the plaintiffs were advised that the company from which the defendants purchased their right of way was claiming this land, is plainly shown by the testimony of Mr. Davidson himself, one of the plaintiffs. He stated that he knew that this land company claimed this land and that the railroad company was asserting a right to it in 1893, when it built the trestle, and put its roadbed upon it, and permitted the slough to be filled up and made solid ground, and neither he nor his co-plaintiffs ever made any claim or asserted any title to this tract. On the other hand, the Belt Company at once recorded its deeds to this property in 1892. It has been said that silence does not estop when the parties' deed is on record, and if both parties have equal means of knowledge, but clearly that cannot be said of the parties in this case. There was

nothing in the record of the plaintiffs' title to block 19 which would indicate at the time that the defend-, ants purchased this land from the Meriwether interest that the plaintiffs had any title thereto, or were claiming the same by way of accretion. Neither do we think it can be said in view of all the testimony that these parties had equal means of knowledge. The plaintiffs, who had been the owners of block 19 since 1874, were fully apprised of the high waters which from time to time threatened to wash away the south bank of the river in front of said block 19 and at times overran the block, and knew the conditions which caused them to assert now that this bank was washed away entirely up to the north line of their block and afterwards refilled, but there is no testimony whatever tending to show that these defendants, when they came upon the ground in 1892 with the view to acquire a right of way and found a permanent riprap bank in front and north of plaintiffs' block, knew that any such condition had ever existed which would justify the plaintiffs in claiming this as an accretion to their block. Nor is this a case in which the plaintiffs can assert title on the ground that they were not apprised of the true state of their own title, for, according to the testimony of Davidson, they knew the full extent of the floods and their effect upon the shores in front of their land. The plaintiffs in their endeavor to show that the defendants had notice of their claim point us to the fact that the Dold Company made a claim when the defendants' road reached that tract on the east, but instead of this strengthening the claim of the plaintiffs, it appears to us that it has the contrary effect. If plaintiffs at that time had acted as Dold did and asserted its claim and forbidden the defendants to occupy this land, it could then have tried out the question of title, before the defendants had gone to the great expense and labor of building this trestle and filling up the slough and constructing its road, but

none of this did they do, but permitted the defendants to spend their money and for years labor and create a valuable property without giving the slightest notice of their claim of the same. Surely it cannot be denied that, if the plaintiffs' claim can now be asserted, it will work a great injury to the defendants. The proposition that the plaintiffs had no knowledge or notice that the defendants were buying or intended to buy the land in question from others than themselves, we think is refuted by all the facts and the testimony in the case.

As said in Schaffer v. Detie, 191 Mo. 377: "The visible possession of real estate, with improvements, cultivation, etc., are as potential in imparting notice of a claim of title as the record of a deed. One may not be allowed to blindfold himself to the visible indices of ownership, such as abound in this case, and say that he had no notice." As to the claim of plaintiffs that the external evidences that the land in question was an accretion to the shore land, were plain and palpable, and as well known to defendants as to plaintiffs, we have already said that the facts within the knowledge of the plaintiffs were unknown to the defendants, and in addition to that, it may be stated that as early as 1891, when the defendants' predecessors in title began to make a survey with a view to getting this right of way, the surveyor found the permanent riprap bank of 1870 there, and all the evidence shows that this bank has remained ever since, and if any accretions had formed to the shore land, they had formed against that bank, but, as the evidence greatly preponderates, when defendants began their work in 1892 there were no accretions to this riprap bank, but there was a slough next to it and north of that slough there was an island, and the defendants, charged with notice of the law of accretions in this State, would understand that a separation of the plaintiffs' lands from the formation north of the slough would preclude

any right to the lands north of the slough as an accretion. We think that the use of the word "accretion," on one of the maps found in the possession of the Belt Company and bearing date December 15, 1892, is of little significance when the history of the map itself is kept in view as already stated.

In view of all that has been said, we are of the opinion that the defendants' answer states facts which entitle them to a decree in equity establishing their title to this right of way as against the plaintiffs and enjoining the plaintiffs from any further interference with their right thereto either by ejectment or by a proceeding for compensation for the right of way.

We think the defendants have made a case under Lee v. Conran, 213 Mo. 404, in which they have set up an equitable defense, and cross-bill and prayer for affirmative relief, and that the trial court correctly ruled that he would in the first instance hear and determine whether the defendants were entitled to a decree in equity, and we think that he correctly found that inasmuch as the title which plaintiffs asserted was not of record, and that defendants had bought their right of way in good faith without knowledge of the claim of the plaintiffs to this land as an accretion to block 19, defendants were clearly entitled to a decree quieting their title to this right of way as against the plaintiffs' claim, both on the ground of equitable estoppel, and on account of the laches of which the plaintiffs were guilty in standing by for five years and permitting the defendants to purchase this land from others who were in actual possession thereof, and in making the large outlays which they did in order to make a permanent track for their railroad over this ground. Counsel on both sides have filed exhaustive briefs and we have read the same with great interest, but in our opinion the circuit court properly treated the cause in the first instance as cognizable in equity for the purpose of quieting the title of the defendants

as against the claim of the plaintiffs. We think that the evidence fully justifies the decree of the circuit court and that the plaintiffs have no ground to complain of the action of the circuit court in denying a jury trial in the case. We think, moreover, that the evidence fully establishes that the defendants bought in good faith, without knowledge of the claim of the plaintiffs, and are entitled to have their title quieted as was done by the decree. Having reached this conclusion it would serve no good purpose for us to extend this opinion to a discussion of other exceedingly interesting propositions which have been mooted and discussed by counsel on either side, or to review the numerous decisions of this State in regard to what constitutes title by accretion, as, in our opinion, the circuit court, having full jurisdiction in equity, properly determined that plaintiffs were not entitled to this land by virtue of an accretion to their block 19.

The decree of the circuit court is accordingly affirmed.